Slip Op. 06-21

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |
|---|---|
| FUYAO GLASS INDUSTRY GROUP CO., GREENVILLE GLASS INDUSTRIES, INC., SHENZHEN BENXUN AUTOMOTIVE GLASS CO., TCG INTERNATIONAL, INC., CHANGCHUN PILKINGTON SAFETY GLASS CO., GUILIN PILKINGTON SAFETY GLASS CO., WUHAN YAOHUA PILKINGTON SAFETY GLASS CO., and XINYI AUTOMOTIVE GLASS (SHENZHEN) CO., | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Plaintiffs, | : |
| v. | : |
| UNITED STATES, | : |
| Defendant, | : |
| and | : |
| PPG INDUSTRIES, INC., SAFELITE GLASS CORP., and VIRACON/CURVLITE, a subsidiary of APOGEE ENTERPRISES, INC., | : <br> : <br> : <br> : |
| Def.-Intervenors. | : |

Before: Richard K. Eaton, Judge

Consol. Court No. 02-00282

_____

OPINION AND ORDER

[United States Department of Commerce's Remand Results on float glass remanded]

Dated: February 15, 2006

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Mark E. Pardo, Paul G. Figueroa*, *Adam M. Dambrov*, and *Bruce M. Mitchell*), for plaintiffs Fuyao Glass Industry Group Co. and Greenville Glass Industries, Inc.

*Garvey, Schubert & Barer* (*William E. Perry*), for plaintiffs Shenzhen Benxun Automotive Glass Co. and TCG International, Inc.

*Pepper Hamilton, LLP* (*Gregory C. Dorris*), for plaintiffs Changchun Pilkington Safety Glass Co., Guilin Pilkington Safety Glass Co., and Wuhan Yaohua Pilkington Safety Glass Co.

*White & Case* (*Adams C. Lee* and *Frank H. Morgan*), for plaintiff Xinyi Automotive Glass (Shenzhen) Co.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Jeanne E. Davidson*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*), for defendant United States.

*Stewart & Stewart* (*Terence P. Stewart*, *Eric P. Salonen*, and *Sarah V. Stewart*), for defendant-intervenors PPG Industries, Inc., Safelite Glass Corp., and Viracon/Curvlite, a subsidiary of Apogee Enterprises, Inc.

Eaton, Judge: This consolidated antidumping action is before the court on the motions for judgment upon the agency record filed by plaintiffs Fuyao Glass Industry Group Co., Greenville Glass Industries, Inc., Shenzhen Benxun Automotive Glass Co., TCG International, Inc., Changchun Pilkington Safety Glass Co., Guilin Pilkington Safety Glass Co., Wuhan Yaohua Pilkington Safety Glass Co., and Xinyi Automotive Glass (Shenzhen) Co. (collectively, "plaintiffs") following two remands to the United States Department of Commerce ("Commerce" or the "Department"). *See Fuyao Glass Industry Group Co. v. United States*, 27 CIT __, slip op. 03-169 (Dec. 18, 2003) (not reported in the Federal Supplement) ("*Fuyao I*") and *Fuyao Glass Industry Group Co. v.*

*United States*, 29 CIT __, slip op. 05-6 (Jan. 25, 2005) (not reported in the Federal Supplement) ("*Fuyao II*").  The Department has now filed its second remand results. *See* Final Results of Redetermination Pursuant to Court Remand (June 9, 2005) ("Remand Results").  For the reasons set forth below, the court remands this matter for a third time.

BACKGROUND

Plaintiffs are exporters to the United States of automotive replacement glass windshields (the "Windshields") from the People's Republic of China, a nonmarket economy country ("NME").[1] The primary issue in this matter is the price plaintiffs paid for float glass[2] purchased from suppliers in the market economy countries of Korea, Thailand, and Indonesia.  Float glass is used in the manufacture of the Windshields.  In addition, plaintiffs have challenged the treatment of certain other factors of production.

---

[1]    A nonmarket economy country is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A)(2000).  "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority."  19 U.S.C. § 1677(18)(C)(i)(2000).

[2]    For information regarding the float glass production process, see http://alzonca.tripod.com/glassprocess.html (last visited Feb. 14, 2006).

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).

STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin,* 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Id.* (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). Furthermore, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F.

Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987)

(citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, *Inc.*,

467 U.S. 837, 843 (1984); *Abbott v. Donovan*, 6 CIT 92, 97, 570 F.

Supp. 41, 47 (1983)).


DISCUSSION

I.   Reasons for Third Remand

In its Final Determination of Sales at Less Than Fair Value:

Certain Automotive Replacement Glass Windshields From The

People's Republic of China, 67 Fed. Reg. 6482 (ITA Feb. 12,

2002), Commerce found that the prices paid by plaintiffs for

purchases of float glass from the market economy countries of

Korea, Indonesia, and Thailand should be disregarded because it

had a reason to believe or suspect that they were subsidized.  In

*Fuyao II*, the court found that, with respect to float glass

exported from Korea and Indonesia,[3] Commerce had not provided

substantial evidence to support its conclusion.  *See Fuyao II*, 29

---

[3]     In *Fuyao II*, the court affirmed Commerce's finding that there was reason to believe or suspect that prices from Thailand were subsidized.  The court stated:

> Commerce has shown that subsidies of the industry in question existed in the supplier country, Thailand, during the period of investigation; that the supplier in question is a member of the subsidized industry, and could have taken advantage of any available subsidies; and that it would have been unnatural for that supplier to not have taken advantage of any available subsidies.

*Fuyao II*, 29 CIT at __, slip op. 05-6 at 15-16.

CIT at __, slip op. 05-6 at 16.  As a result, the court directed:

> On remand, Commerce may concur with the court's
> conclusion or, if it continues to find that it has
> reason to believe or suspect that these prices were
> subsidized, it must re-open the record to provide, if
> possible, additional evidence to support its conclusion
> that the prices Fuyao paid to its suppliers were
> subsidized.

*Id.*

In the Remand Results, Commerce states that it "has complied with the Court's instructions and has recalculated the Plaintiffs' normal value using the purchase prices paid by Plaintiffs to the market-economy suppliers. . . . [H]owever, the Department has respectfully done so under protest."  Remand Results at 4 (footnote omitted).  In other words, given the choice of re-opening the record and conducting a further literature review,[4] or concurring with the court's finding that its conclusions as to subsidization were not supported by substantial evidence, Commerce has instead chosen a third approach, i.e., it concurs with the court's substantial evidence conclusions, but does so "under protest."  *Id.*  By stating that it is issuing its Remand Results under protest, Commerce appears

---

[4]     In seeking evidence with respect to subsidization, Commerce reviews available publications.  For example, with respect to Thailand, Commerce reviewed the World Trade Organization Trade Policy Review for Thailand; the U.S. Trade Representative's 2001 National Trade Estimate Report on Foreign Trade Barriers for Thailand; reports downloaded from the Thailand Board of Investment Web site; and various news articles concerning glass supply in Thailand.  *See Fuyao I*, 27 CIT at __, slip op. 03-169 at 18-19, 21.

to be signaling that it may appeal this court's judgment should the Remand Results be sustained. *See, e.g., Former Employees of S. Triangle Oil Co. v. United States*, 15 CIT 150, 150 (1991) (not reported in the Federal Supplement) ("The Department complied under protest and thereafter filed an appeal with the Court of Appeals for the Federal Circuit.").

While Commerce's decision to recalculate normal value using the actual prices paid is no doubt a good faith effort to bring this matter to a more speedy conclusion, the court cannot sustain the Remand Results for three reasons. First, Commerce has not complied with the court's remand instructions. These instructions directed Commerce to take one of two courses of action: either (1) concur with the court's conclusions with respect to substantial evidence; or (2) re-open the record to provide, if possible, additional evidence to support its conclusion that the prices Fuyao paid to its suppliers were subsidized. *Fuyao II*, 29 CIT at __, slip op. 05-6 at 16. Neither of these choices on remand permit Commerce to affect to adopt the court's conclusions as to substantial evidence without actually doing so. That is, Commerce's choices were to actually concur in the court's substantial evidence conclusions or re-open the record. Having done neither, on remand, it must make its choice between the court's two prescribed courses of action.

The second basis for directing a remand is related to the first. Although it has recalculated plaintiffs' normal value using the prices paid to market economy suppliers, Commerce has failed to adequately explain its reasons for deciding to do so. *See Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . ."); *Touros Records, Inc. v. DEA*, 259 F.3d 731, 737 (Fed Cir. 2001) ("A fundamental requirement of administrative law is that an agency set forth its reasons for decision.") (internal quotations omitted); *Int'l Imaging Materials, Inc. v. United States*, 29 CIT __, __, slip op. 06-11 at 13 (Jan. 23, 2006) (not published in the Federal Supplement) ("An agency must explain its rationale . . . such that a court may follow and review its line of analysis, its reasonable assumptions, and other relevant considerations. Explanation is necessary . . . for this court to perform its statutory review function.") (internal quotations omitted). The "under protest" language is simply not a sufficient explanation of Commerce's reasons for recalculating plaintiffs' normal value. On remand, Commerce must explicitly state its reasons for reaching the decision to engage in the recalculation.

Finally, as discussed in greater detail *infra*, it is apparent that the Department has not conducted its analysis in

accordance with the court's finding with respect to the use of the word "are" rather than "may be" when applying its subsidized price methodology.  On remand, Commerce must explicitly state that it is doing so.

II. The Second Remand Results

While Commerce has not explained its reasons for recalculating normal value, the Remand Results do contain considerable explanation as to why such recalculation is not required.  Thus, a discussion of the Remand Results is in order.

In *Fuyao I*, this court found that Commerce had justified the use of a methodology it developed for valuing the factors of production in an NME context.  *Fuyao I*, 27 CIT at __, slip op. 03-169 at 14.  Part of that methodology was based on the legislative history for 19 U.S.C. § 1677b(c)(4) which states: "[I]n valuing such factors [of production for merchandise under investigation], Commerce shall avoid using any prices [paid by the NME exporters to suppliers of inputs from market economy countries] which it has reason to believe or suspect may be dumped or subsidized prices."  Omnibus Trade and Competitiveness Act of 1988, H.R. Conf. Rep. No. 100-576, at 590 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1623.  In other words, under this methodology, where it has reason to suspect subsidization of sales prices, Commerce does not use the actual prices paid to

market economy suppliers to value factors of production.  In that

situation, Commerce looks to surrogate prices.


Although Commerce's methodology was found to be in

accordance with law, the court was also explicit as to its

understanding of what the methodology required.

> In developing its methodology for selecting values for
> factors of production in NME situations, Commerce
> appears to have established a higher standard than
> would necessarily be required.  "The legislative
> history and recent Department determinations support
> the principal [sic] that we should disregard prices we
> have reason to believe or suspect *are* distorted by
> subsidies."  Issues and Decision Mem. at 10 (emphasis
> added).  When reaching its findings with respect to
> subsidization, Commerce stated that the evidence
> supports the conclusion: (1) that "it is reasonable to
> infer that all exports to all countries *are*
> subsidized," *Id*. at 11, and (2) that there is
> "particular and objective evidence to support a reason
> to believe or suspect that prices of the inputs from
> that country *are* subsidized."  *Id*.  The legislative
> history relied upon to establish the reasonableness of
> its methodology, however, instructs Commerce to avoid
> prices "which it has reason to believe or suspect *may* .
> . . be subsidized." Conf. Rep. at 590 (emphasis added).
> Commerce apparently has concluded it should be held to
> this higher standard, and there is nothing to indicate
> that this decision is unreasonable.  That being the
> case, the court's analysis will be in accordance with
> the standard evident in Commerce's selected
> methodology.

*Fuyao I*, 27 CIT at __, slip op. 03-169 at 17 n.14.  In the text

of its Remand Results, however, Commerce continues to take issue

with the court's finding in *Fuyao I* as to the standard it must

support with substantial evidence.  Remand Results at 5.  In

doing so, Commerce insists that it is not required to support

with substantial evidence, the conclusion that it has a reason to believe or suspect that float glass inputs *are* subsidized.  *Id.* Instead, the Department maintains that the use of  "are" rather than "may be" was "inadvertent."  *Id.*  In addition, the Department claims, in effect, that whether the word "are" or the words "may be" follow the words "reason to believe or suspect," the standard is the same.  *Id*. at 7.  Neither of Commerce's arguments is convincing.  While it may be that its choice of words was "inadvertent," words are the only guide available to the parties and the court.  That being the case, Commerce cannot now be heard to claim that it did not mean what it said.  With respect to the argument that its use of "are" did not change the standard, it is simply not the case that to say that a set of facts "are true" is the same as saying that those facts "may be true."  Even so, in the Remand Results, and for that matter in defendant-intervenors' brief, "may be" is regularly substituted for "are."

   Next, Commerce states that although it "does not necessarily agree that it needs to meet th[e] three-prong test" for subsidies set forth in *Fuyao II*, it has nevertheless provided record evidence to satisfy that test.  *Id*. at 10.  The court's test

requires Commerce to show by "specific and objective evidence"[5]

that: (1) subsidies of the industry in question existed in the

supplier countries during the period of investigation; (2) the

supplier in question is a member of the subsidized industry or

otherwise could have taken advantage of any available subsidies;

and (3) it would have been unnatural for a supplier not to have

taken advantage of such subsidies. *See Fuyao II*, 29 CIT at __,

slip op. 05-6 at 15.  In the Remand Results, without offering any

new evidence, Commerce reiterates its position from the first

remand results, Final Results of Redetermination Pursuant to

Court Remand (Mar. 18, 2004) ("First Remand Results") that

> the record evidence of the numerous CVD [countervailing
> duty] determinations, [World Trade Organization]
> notifications, and USTR [United States Trade
> Representative] Reports supports the Department's basis
> for its reason to believe or suspect the Korean and

---

[5]      *See China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 27 CIT __, __, 264 F. Supp. 2d 1229, 1239 (2003) ("[T]he 'reason to believe or suspect' standard . . . must be predicated on particular, specific, and objective evidence.").  Commerce does not dispute this criteria, noting in the Remand Results that it
> relied on the particular and objective evidence of
> previous countervailing duty ("CVD") investigations and
> reviews, in addition to numerous other sources of
> information, that were generally available at the time
> to support its conclusion that the market-economy
> purchase prices in this case were likely to be
> distorted by broadly available, non-industry-specific
> export subsidies.

Remand Results at 5.

Indonesian float glass producers may[6] have been subsidized because this information was contemporaneous and generally available at the time of the investigation.

Remand Results at 22.

In *Fuyao I*, the court found that "none of the record evidence for Korea . . . or Indonesia indicates whether the subsidy programs cited by Commerce are available to all exporters, or to float glass producers in particular, in the supplier countries." *Fuyao I*, 27 CIT at __, slip op. 03-169 at 22. The court explained:

First, none of the more than 80 countervailing duty determinations cited by Commerce concerning Korean subsidies involved float glass, the product at issue in this case, nor for that matter did any of the countervailing duty determinations involve glass of any kind. . . . As to Indonesia, one of the countervailing duty determinations cited by Commerce concerns extruded rubber thread, and all of the others concern apparel and textiles (luggage, handbags, gloves, and the like). Not one of the determinations concerned float glass.

*Id.* at __, slip op. 03-169 at 20, 21–22. In addition to its CVD determinations, Commerce cited World Trade Organization ("WTO") Reports for Korea and Indonesia as "particular and objective evidence which supports [its] reason to believe or suspect that the market economy purchase prices of float glass in this case may be subsidized." First Remand Results at 33. With respect to

_____

[6]     As has been noted, Commerce now regularly uses "may" where it previously used "are."

these reports, the court in *Fuyao I* stated:

> The WTO report for Korea indicates only that "Korea has aggressively promoted exports through a variety of policy tools," but does not indicate which exporters benefit from such tools . . . [and] the WTO Report for Indonesia, which reviews exports subsidies and other promotion policies in that country, was completed in 1999, one year before the period of review for this investigation.

*Fuyao I*, 27 CIT at __, slip op. 03-169 at 20, 22 (internal citation omitted).  Commerce also cited the U.S. Trade Representative's 2001 National Trade Estimate Report on Foreign Trade Barriers ("NTE Report") concerning Korea's and Indonesia's export subsidy practices.  As to this report, the court in *Fuyao I* stated: "[T]he NTE Report [for Korea] discusses several export loan and credit programs, but does not indicate which sectors, producers, or products are eligible for such aid. . . .  The NTE Report for Indonesia indicates that the export subsidies for 'special exporters' (a term which is not defined) lapsed in 1999."  *Id*.  The court restated its holding in *Fuyao II*, explaining that "it is evident that, in large measure, Commerce has chosen to present nothing new with respect to these matters; therefore, the observations contained in *Fuyao I* remain valid." *Fuyao II*, 29 CIT at __, slip op. 05-6 at 14.

Finally, Commerce and defendant-intervenors seem to be under the impression that the court is demanding that there be a demonstration that the float glass industry in particular be

found to be subsidized in order to meet the standard.  This is
simply not the case.  Rather, the court's finding was that
Commerce had failed to demonstrate that either: (1) the Korean
and Indonesian float glass industries were subsidized; or (2)
that there were generally available subsidies of which the float
glass industry could take advantage.  With respect to industry
specific subsidies, Commerce has not attempted to show that these
existed in either country during the period of investigation.  As
to generally available subsidies, the Department's efforts have
simply fallen short.  That is, while Commerce has provided
evidence that some exports from Indonesia would satisfy the
reason to believe or suspect test, for example, rubber thread,
apparel, and textiles, and that there are subsidies for "special
exporters," this evidence is not sufficient to demonstrate the
existence of generally available subsidies.  Similarly, the more
than 80 countervailing duty determinations concerning Korea deal
almost exclusively with products made of steel; none concern
glass.  Thus, while defendant-intervenors insist that a broad
range of industries and producers of twenty-four product
categories[7] were found to have benefitted from the same subsidy

---

[7]    It appears to the court that only thirteen product
categories are, in fact, represented.  Those categories are:
certain steel products; industrial belts; stainless steel cooking
ware; carbon steel plate; stainless sheet and strip in coils;
steel sheet and strip in coils; steel plate in coils; structural
steel beams; oil country tubular goods; platform jackets and
piles; bicycle tires and tubes; steel flat-rolled products; and

programs, these categories are sufficiently restrictive as not to provide substantial evidence showing that generalized subsidies were available.

As the court stated in its remand instructions, "Congress did not intend that Commerce conduct a formal investigation to determine a company's particular subsidy level . . . ." *Fuyao II*, 29 CIT at __, slip op. 05-6 at 16.  Commerce has chosen, however, not to re-open the record and examine the literature for evidence to support its determination.  As a result, the court continues to find, as it did in both *Fuyao I* and *Fuyao II*, that the defendant has failed to provide specific and objective evidence to support its conclusion that it had a reason to believe or suspect that prices from Korea and Indonesia were subsidized.

III. Commerce's Other Findings

Because plaintiff's comments with respect to Commerce's other findings may be influenced by the Department's third remand results, the court defers consideration of those findings pending the remand results ordered here.

---

cold-rolled and corrosion-resistant flat products.  *See* Conf. R. Doc. 92, Ex. 1.

CONCLUSION

For the foregoing reasons, the court remands this matter to Commerce for further action in accordance with this opinion.

Remand results are due on May 16, 2006, comments are due on June 15, 2006, and replies to such comments are due on June 26, 2006.

/s/ Richard K. Eaton
Richard K. Eaton, Judge

Dated:    February 15, 2006
          New York, New York